# Wheeling.

## JOHN T. PEERCE *et al. vs.* JAMES CARSKADON.[*]

### January Term, 1870.

1. Enemies in war have no right to enter and use the courts of the adverse party. It is competent for the legislature to permit them to do so on such terms as the legislature may prescribe. The exercise of these powers is within the scope of legislative discretion, and is not repugnant to the constitution of the United States, nor of the constitution of this State; neither does it transcend the limits of legislative power, as it springs originally from the social compact.

2. Such a power in the State is conservative and remedial, and not akin to despotism, nor for the sake of punishment.

3. War gives the right *flagrante bello,* to forfeit and confiscate the property and debts of the enemy. These rights and powers apply as well to the lawful government, whether State or National, in a civil war, to suppress a rebellion, as to independent sovereignties in international wars.

4. In such a war it is competent to the established and lawful government to wield its sovereign, as well as its belligerent powers, to suppress the rebellion and punish the insurgents.

5. The act[†] of February 11th, 1865, requiring parties to take a certain oath therein prescribed, before they are entitled to a rehearing in the matter of a judgment on an attachment, is not unconstitutional.

This suit was brought in Preston county, in August, 1864, by James Carskadon against Charles Williams, Joseph V.

[*]This case was heard at July term, 1868, and the decision announced, but the opinion was not pronounced until this term. The case was heard by Judges Brown and Maxwell. Absent, Harrison, J.

† "27. If a defendant, against whom, on publication, a judgment or decree has been or shall hereafter be rendered in an action or suit in which an attachment has been or may be sued out and levied, as provided in this chapter, or his personal representatives, shall return to or appear openly in this State, he may, within one year after a copy of such judgment or decree shall be served upon him, at the instance of the plaintiff, or within five years from the

Williams, John T. Peerce and Charles H. Vandever. The action was trespass. An attachment was also issued in the case, under the statute providing that, if parties were in sympathy with the rebellion, and had left their usual places of abode and were out of the reach of civil process for ninety days, they were to be regarded as non-residents. A judgment was had against Peerce and Charles Williams in December, 1864, for 700 dollars. The defendants petitioned, in September, 1865, for a re-hearing, filing therewith an affidavit to support the constitution of the United States, and of this State, but failing to take the oath provided by the act of February 11th, 1865. The court refused to permit the petition to be filed and the case to be re-heard, because of the failure to take the oath prescribed by the latter act. The defendants brought the case here for review.

Hon John A. Dille, Judge of the circuit court of Preston county, presided on the trial of the case.

*Boggess* for the plaintiffs in error.

*Stanton & Allison* for the defendant in error.

date of such judgment or decree, if he be not so served, petition to have the proceedings reheard. * * * The said petition when not presented on behalf of a corporation, shall be accompanied by the affidavit of such defendant or his personal representative, stating the following facts:—*First,* That such defendant never voluntarily bore arms against the United States, the reorganized government of Virginia or the State of West Virginia. *Second,* That such defendant never voluntarily gave aid or comfort to persons engaged in armed hostility against the United States, the reorganized government of Virginia or the State of West Virginia, by countenancing, counseling or encouraging them therein. *Third,* That such defendant never sought, accepted, nor attempted to exercise any office or appointment whatever, civil or military, under any authority, or pretended authority, hostile to the United States, the reorganized government of Virginia, or the state of West Virginia. *Fourth,* That such defendant never yielded any voluntary support to any government or pretended government, power or constitution, within the United States, hostile or inimical thereto, or hostile or inimical to the reorganized government of Virginia or the State of West Virginia: Provided, nevertheless, that if the judgment or decree be against several defendants upon a demand founded on contract, the court may order a rehearing and permit defence to be made on behalf of all the said defendants, if the petition be accompanied by the affidavit of any one of them stating the facts above mentioned," &c.

BROWN, *President.*

Carskadon, the defendant in error, sued and recovered a judgment in 1864, on attachment against the plaintiffs in error, for an alleged trespass in taking and carrying away his cattle. In September, 1865, the plaintiffs in error, by their attorney, presented their petition in court for a rehearing of the case, but not in conformity with the act of February, 11th, 1865, and asked to have the same filed; to which the defendant in error objected, and upon consideration, the court refused to permit the petition to be filed, because the affidavit to it did not conform to the provisions of the said act. To this refusal of the court the plaintiffs in error excepted, and the ruling of the court in rejecting the petition is the subject of review in this case. But as the ruling of the court is in conformity with the act of February 11th, 1865, the validity of the act, and the power of the legislature to enact it, become the grave subject of consideration.

After a careful consideration of the subject presented in this case, the arguments of counsel, and the various authorities cited, I have come to the following conclusions:

1. That enemies in war have no right to enter and use the courts of the adverse party.

2. That it is competent for the legislature to permit them to do so on such terms as the legislature may prescribe.

3. That the exercise of these powers is within the scope of legislative discretion; and is not repugnant to the constitution of the United States, nor to the constitution of this State; neither does it transcend the limits of legislative power, as it springs originally from the social compact.

4. That such a power in the State is conservative and remedial, and not akin to despotism, nor for the sake of punishment.

5. That war gives the right, *flagrante bello,* to forfeit and confiscate the property and debts of the enemy.

6. That these rights and powers apply as well to the law-

ful government, whether State or National, in a civil war to suppress a rebellion, as to independent sovereignties in international wars.

7. That in such a war it is competent to the established and lawful government to wield its sovereign, as well as its belligerent powers, to suppress the rebellion and punish the insurgents.

Whether it is politic and wise to exert these powers in a particular instance or in a particular manner, or to a given extent, is a question not properly belonging to the court to determine, but rather for the legislative discretion.

Satisfied of the existence of the power in the legislature, and the obligation of its action upon the people, the business of the court is to expound and apply, and leave to the legislature to alter or repeal. And, now, applying these principles to the case at bar: a civil war existed, in which the government of the United States was endeavoring to suppress the rebellion of a portion of the people against its lawful authority. The State of Virginia, through her reorganized government, prior to the division of the State, and the State of West Virginia subsequently lent their aid, as in duty bound, in that general effort; but, in addition to that they organized and equipped military forces of their own respectively, at their own expense, which, acting under the command of their respective officers, and independently of the armies of the Union, were employed by them in their own defence against their common enemies who invaded their territories, killed, captured, carried off, and imprisoned their loyal people, and sought by military force to subvert their governments and annihilate the existence of one of those States, and to subject the people of both to a hostile and treasonable jurisdiction.

And this state of things is recognized by numerous acts of the legislature, the proclamation of the Governor, and other executive documents; and by the courts throughout the State. Pending this State of war, and as a war measure, the State of West Virginia had an un-

doubted right to defend herself, as well by the exercise of her military powers, when the government of the United States failed to render adequate protection, as by the exertion of her sovereign powers. To that end, she also had a right to forfeit and confiscate the property and debts of her enemies, and close her courts against their entrance and use, save upon such terms as she might prescribe; and so she did, and the act in question is but one of a number of the like kind. It prohibits a party against whom a judgment has been recovered as an absent defendant in sympathy with the rebellion, who left his home on that account, so that process could not be served on him, from appearing in court and opening said judgment, unless he would take a prescribed oath in effect purging himself from all complicity with said rebellion. The State of West Virginia had the power to pass that act.

The British Parliament has exercised like power in passing confiscation acts. The Colonial legislature of Virginia did the same in the Bacon rebellion, with circumstances of great harshness and severity.

All the States of the Union did it in the war of the revolution. The American congress has done it in a series of acts in the present rebellion. So, also, all the border States, by which is meant the States bordering on the hostile districts in the late rebellion, and whose territories and people were particularly involved more or less in the hostilities.

This right of the States to confiscate the enemies' property, and to punish traitors, is fully recognized by Great Britain and the United States in the treaty of 1783. See the case of *Reed* vs. *Reed*, 5, Call, 161, where the subject of these confiscation laws, and especially the Virginia act, was considered and discussed with learning and ability. Judge Roane said : " Perhaps I shall be warranted in saying that there were, in fact, such confiscations made by every State in the Union. See Hammond's letter to Jefferson. * * * The Virginia act, upon this subject, after reciting that, by the declaration of Independence by the United States, the resid-

uary subjects-of the British empire became enemies and aliens to the said State, enacts, that all the property lying within the commonwealth belonging at that time to any British subject, &c., shall be deemed to be vested in the Commonwealth; and a subsequent clause describes who shall be deemed British subjects within the meaning of the act. October, 1779, chapter 14.

" The passage of the act *ipso facto*, confiscated the property therein contemplated; and the only enquiry necessary to be made, or which, in fact, was made, (see inquisitions in the office of the general court,) under this act, as it respects the proprietors of the land, was whether he were a British subject or not, within the meaning of the act; there was no enquiry whether he was, by law, an alien.     *     *     *

"During the existence of the war, the ordinary law of escheat and forfeiture had not been put in force against British subjects. It had yielded to the more powerful and direct course of legislative confiscation which was deemed preferable and was universally pursued." Again: "This article, (of the treaty of 1783,) upon the whole context of it taken together, can only relate to those who, being American citizens, afterwards became refugees, and joined the enemy; it cannot relate, (in a collective point of view,) to real British subjects. Keeping out of view, for the present, that member of the article which prohibits future confiscacations, and which requires a more particular examination, would it not be absurd to stipulate that after peace had taken place between the two nations, we should commence no prosecutions against real British subjects for the part they had taken in the war? That part was not in them a culpable part; it was one which their duty and allegiance as subjects required them to take. Not residing in this country, nor being oppressed as the Americans were, it was not their business to join in our revolt, nor to take part in our battles.

" If there had been no such article in the treaty, and America had thereafter commenced such prosecutions against British subjects, Great Britain would have justly considered

them as acts of hostility against her. This provision, then, as relative to real British subjects, is wholly superfluous and unnecessary; it shall not, therefore, be construed to have relation to them. But with respect to the American refugee, this stipulation was strictly necessary and proper. They did become citizens of the American States, and without expatriating themselves, had joined the standard of the enemy. After the peace, the several States might justly have called these, their offending citizens, to a severe account for their conduct; but the humanity and honor of the British nation was deeply interested to protect them; to protect these American traitors from the vengeance of their own governments. The latter part of this article, therefore, applies exclusively to them, however it may be with the former. The interdiction of prosecutions for the part they had taken in the war, and loss or damage accruing therefrom, as it related only to them, so it alone effectually secured them from such common law forfeitures as were incident to attainders or prosecutions for treason. As to confiscations, in relation to these persons, as they were not legally aliens, in the several States, they were already sufficiently safe from the effects of the laws of alienage.

"The inhibitions, then, of legislative confiscations, conjoined with the interdiction of prosecutions on account of the part taken in the war, would entirely secure and protect the refugees."

It seems to me that much confusion is produced in the minds of men, by failing to keep in view an important distinction between the powers of a government in war and in peace, and what a government may lawfully do to its enemies in war, which it might not do to its loyal citizens, even in the midst of war, nor to an alien who is not an enemy. And in the case referred to Judge Roane said: "Besides this ordinary and municipal right of forfeiture, there is, as I have before said, an extraordinary one accruing to belligerent nations, of confiscating the property of their enemies. This right does not await and attend on the contin-

gent event of a purchase by, or descent to, an alien; it affects property then actually holden by the enemy; it is .not carried into effect by the ordinary course of the municipal laws; the property is seized and confiscated by an extraordinary act of the government of the belligerent nation. It is seized, not because it is the property of the alien, but of an enemy. This right is technically and properly denominated a right of confiscation; I know of no other term which will properly designate it."

It seems to be supposed that, although the government may confiscate the property of its alien enemies, yet that it cannot so deal with the property of those of its enemies who are not aliens, but citizens. And the reason urged for this strange theory is, that being citizens, if guilty of treason and rebellion, they can only be tried for those crimes by indictment according to the course of the common law, and that until so convicted, the fact cannot appear which makes them enemies. It might be that a law which should punish the parties criminated for their treason and rebellion, otherwise than according to the common law, would be repugnant to the constitution, because that makes no distinction in the trial of a party for those crimes, whether he be citizen, friend, or enemy. But in such case the party is not dealt with as an enemy, but simply as an individual, for his alleged violation of the law. But when a government makes war upon its enemies, its right to confiscate their property as a war measure is unquestionable; and it is the same whether its enemies be citizens or aliens, or both; nor is it limited to this right of confiscation by any means, but the enemies, whether citizens or aliens, may be lawfully slain in battle, or captured, and detained as prisoners of war till the war ends, or till exchanged; their arms, ammunition, and stores may be lawfully taken and used or destroyed; articles, contraband of war, being sent to them, may be lawfully confiscated; their ports may be lawfully blockaded, their property on the high seas may be lawfully seized as prizes of war, and many other things may be

lawfully done to them, which it would not be lawful to do, but for the fact of the existence of a state of war, and the character of the parties affected as enemies.

In the *Prize cases*, 2 Black, it was said by Judge Grier, delivering the opinion of the supreme court of the United States, that, " They have cast off their allegiance, and made war on their government, and are none the less enemies because they are traitors." In other words, he asserts unequivocally in this proposition, that rebels in a civil war are both traitors and enemies, and the one no less because of the other; and they are equally liable to be dealt with in either character by the lawful government.

When the judgment in question was rendered in 1864, on attachment against the property of the plaintiffs in error, if not enemies, they had the right, upon complying with the requisitions prescribed by the legislature in the form of the statute then existing, to appear and show cause why the said judgment should not be set aside, and a new judgment rendered on the new case so presented; but this privilege could only be had on the terms prescribed. If the plaintiffs in error were enemies when the judgment was rendered, they had no such right or privilege as above stated.

For it is too clear and well settled to admit of debate, that an enemy has no right to invoke the aid of the courts any more than of the legislature or executive of the other belligerent.

That it was competent to the legislature to alter or modify the terms and conditions of the preceding statute cannot, as a general proposition, be questioned, provided no vested right was thereby invaded.

Now when the act in question passed on the 11th of February, 1865, not only a state of public war existed, but a state of actual hostilities existed, and the embattled hosts were collecting all their powers for a renewal of the desperate conflict, which wasted the nation in its friends and foes, and periled the very existence of the Union and the State.

The object of the act, then, would seem to have been, not

so much to take away any right which the enemies of the State and of the Union had, to invoke the aid and command the services of the courts in undoing what they had done in behalf of the suitor, but to provide a more easy, simple, and practical mode of distinguishing between friends and enemies, or in other words, who had a right to appear and be heard, and who had not.

Now, if the plaintiffs were enemies, within the purview of the act at the time it passed, they had no right as we have seen, to appear and demand a rehearing. It is not, I believe, seriously denied, even by the most strenuous opposers of the power of the legislature to abolish slavery, that it is competent to liberate the *post nati*, without violating the vested rights of property. By the law, the master of the slave mother would be the owner of the slave child when it is born, but not before, and if before its birth the law which would enslave it should be repealed, or which is equivalent, if a law should be passed making the child free as soon as born, it could not be maintained as in violation of any vested right in the master of the mother.

So, too, in this case, if the plaintiffs were enemies, having no right, as we have seen, either before or after the passage of the act in question, to appear and litigate the case once determined, so long as the war lasted, or at least so long as their character of enemies continued, they had but a contingent possibility of doing so, after the war was over, but this possibility was contingent on the chance of a legislative prohibition in the mean time.

If an enemy of the State had property within its jurisdiction, such enemy could not sue for it in the courts of that State pending the war, though he might do so after the return of peace, so far as the common law is concerned, (*Sanderson* vs. *Morgan*, 39 New York, 231,) unless prohibited by some positive restriction, on the part of the offended State. But pending the war, his property might lawfully be confiscated, and then his right to sue for it, even after the return of peace, would be lost or destroyed.

And the same effect as to the enemy would follow if the State should prohibit the revival of the privilege to sue or litigate for the same subject matter. But this latter is not even substantially the effect of the act in question, for it confiscates no property nor took away any existing or vested right to sue; it simply defeats in a certain event the revival of a contingent possibility of a right to have a rehearing of a case once determined; such as Judge Roane, in the case of *Reed* vs. *Reed,* calls, "Not actual interests, but mere possibilities of interest," interests emphatically *in nudibus;* interests often assailed by the acts of our legislature, and reprobated by the decisions of our courts. As well might the eldest sons of our citizens complain of the destruction of the right of primogeniture, leaving their fathers, as these British subjects object, that long antecedent to the accruing of their claims, they should be thrown into the class of aliens by the natural and necessary effect of our pre-existing municipal regulations.

How far the validity of the act in question may be affected by other cases which may arise under it, I do not feel called on to consider, but confine myself to its application to the case at bar; and in doing so, I am constrained to say I see nothing in it repugnant to the constitution, nor does it, so far as this case is concerned, transcend the just limits of legislative power as it is derived originally from the social compact.

For it is not to be denied that not only is the exercise of legislative power limited and constrained by the organic law which the people, the source of all power, have ordained in the form of the constitution; but civil power is itself limited by its own nature to the objects of the civil compact. For, as Mr. Rutherford, in his Institutes on Natural Law, has well said, that, "As this is a power formed for certain purposes, it cannot in its own nature be so far absolute as to be free either to promote those purposes or to prevent them."

The Bill of Rights of Virginia, unanimously adopted June

12th, 1776, and reaffirmed repeatedly by the conventions and the people, declare that "all power is derived from the people," and "that government is instituted for their benefit and protection." Quickly following this solemn announcement, the Declaration of Independence repeated the important truth, that "governments derive their just powers from the consent of the governed," and are instituted to secure the rights of life, liberty, and happiness. The same doctrine is reordained in the constitution of our own State. The learned author of the Institutes on Natural Law, before referred to, page 370, also says: "This power of civil society to alter or restrain the rights of mankind, is limited by its own nature. It extends no further than the purposes of the social compact, by which it was produced; as the parties to this compact only bind themselves to act for the common good of the whole society and of its several parts, so the power which is produced by this compact, can, in its own nature, extend only to such restraints or alterations of any of the rights of mankind, as in the judgment of the common understanding are necessary or conducive to those purposes. Civil legislative power, therefore, is not in the strict sense of the word an absolute power of restraining or altering the rights of the subjects; it is limited in its own nature to its proper objects; to those rights only in which the common good of the society, or of its several parts, require some restraint or alteration. So that, whenever we call the civil legislative power, either of society in general, or of a particular legislative body within any society, an absolute legislative power, we can only mean that it has no external check upon it in fact; for all civil legislative power is, in its own nature, under an internal check of right; it is a power of restraining or altering the rights of the subjects for the purpose of advancing or securing the general good, and not of restraining or altering them for any purpose whatever, and much less, for no purpose at all. This internal check may possibly fail of guarding the rights of individuals against undue restraints or alterations;

because, by the consent of such individuals, when they became members of a civil society, they left it to the common understanding of such society to determine what restraints or alterations of their rights might be necessary or conducive to the general good; and the society may possibly abuse this trust.

"The danger is still greater if the society has gone further, and has established a particular legislative body, for this point is then left to be determined by the understanding of such legislative body. To prevent such abuse, it is necessary to provide some external checks upon the exercise of civil legislative powers; more especially when it is not exercised by the whole collective body of the society, but by some particular part of it, which is called its legislative body. For, though it is possible that the whole collective body, if it could conveniently meet together, might, in the laws which it makes, exceed the limits of legislative power, and restrain or alter the rights of individuals, where the good of the whole, or of its several parts, required no such restraint or alteration; yet it is not very likely that this would happen, because, as each of the members will be ready to take care of his own particular interest, it is not likely that any of the rights of individuals should be altered or restrained by the act of all or a majority, unless the restraint or alteration was necessary or conducive to the proper ends of civil society. But where the legislative power is entrusted with a part of the society, if this legislative body has no checks upon it, besides the internal check of natural right, it might be led, by motives of private interest, or by caprice or by partial regard, to alter or restrain the rights of some, or of all the subjects, without any view to the general benefit. It is the business of the politician, in order to guard against any such excess in the exercise of legislative power, to contrive some external checks upon the legislative body."

And in this respect, it is our good fortune to live in a State whose constitution has provided for this contingency so clearly presented by the learned author. It is effectu-

ally done, in addition to other provisions of the constitution, in the establishment of co-ordinate and independent departments of the government; the judiciary, no less than the legislature deriving its just powers from the same fountain and source of all governmental power, the people, and each prohibited to exercise the powers properly belonging to the other. That is, the judiciary cannot turn legislature and make laws, nor can the legislature convert itself into a judicial tribunal, to expound, apply, and execute the laws, save in the particulars pointed out and conferred in the constitution.

One of the most solemn and responsible duties of the judiciary in the exercise of its high functions, is to determine what the law is; what the solemn sanctions which make it such, or whether within the scope of legislative authority, without which it is but the unauthorized mandate of usurpation or despotism. Should, therefore, the legislature assume to exercise a power, though not prohibited by the express limitations of the constitution, yet should be no part of the civil power springing from the social compact, but an unwarrantable usurpation of arbitrary power, it would be the solemn duty of the judiciary to interpose in the exercise of its judicial functions, and pronounce the pretended law a nullity. Nor could the courts shrink from this high duty any more in such a case, than in the case of a plain and palpable violation of the express prohibition of the constitution. Entertaining these views, I should not hesitate to pronounce this statute void, if I thought it plainly obnoxious to either of these objections.

A like view is indicated by Chief Justice Marshall, in *Fletcher* vs. *Peck*, 6 Cranch, 135, when he said: "It may well be doubted, whether the nature of society and of government does not prescribe some limits to the legislative power; and if any be prescribed, where are they to be found, if the property of an individual, fairly and honestly acquired, may be seized without compensation. To the legislature, all legislative power is granted, but the question

whether the act of transferring the property of an individual to the public be in the nature of the legislative power, is well worthy of serious reflection." See also Chase's opinion in *Calder* vs. *Ball*, 3 Dal., 388, and *Williams* vs. *Leland*, 2 Pet., 627.

The objection, therefore, that this act violates vested rights, and is also an *ex post facto* law, I do not think well taken. I have not been able to see that it is obnoxious on either of these grounds, so far as this case is concerned.

When a case shall arise resting on these objections, and to which they may be properly applicable, it will be time enough then to consider and determine them. With the views I have taken of this case, I have not found it either necessary or proper to do so now.

I think, therefore, the judgment of the court appealed from should be affirmed, with costs to the defendant in error.

Maxwell, J., concurred.

JUDGMENT AFFIRMED.